**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MIGUEL GALINDO SIFUENTES, *Petitioner-Appellee*, <br><br> v. <br><br> P. D. BRAZELTON, *Respondent-Appellant*. | No. 13-17603 <br><br> D.C. No. 4:09-cv-02902-PJH <br><br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, Chief District Judge, Presiding

Argued and Submitted May 12, 2015
Submission Vacated June 24, 2015
Resubmitted February 10, 2016
San Francisco, California

Filed February 18, 2016
Amended June 9, 2016

Before: Diarmuid F. O'Scannlain and Sandra S. Ikuta,
Circuit Judges and James A. Teilborg,[*] Senior District
Judge.

---

[*] The Honorable James A. Teilborg, Senior District Judge for the U.S. District Court for the District of Arizona, sitting by designation.

Order;
Opinion by Judge Ikuta

## SUMMARY[**]

### Habeas Corpus

The panel filed (1) an order amending its opinion and denying a petition for rehearing en banc and (2) an amended opinion reversing the district court's judgment granting a habeas corpus petition that challenged the prosecutor's decision to excuse nine black prospective jurors in the petitioner's trial for first degree murder of a police officer.

Applying the doubly deferential standard for reviewing a determination under *Batson v. Kentucky*, the panel held that the California Court of Appeal's decision that the petitioner had not carried his burden of showing the prosecutor acted in a purposefully discriminatory way was not based on an unreasonable determination of the facts. The panel also held that the trial court's decision to preclude the petitioner from responding to the prosecutor's race-neutral explanation for his strikes was harmless.

The panel remanded with instructions to dismiss the petition.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Kamala D. Harris, Attorney General of California, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Peggy S. Ruffra, Supervising Deputy Attorney General, John H. Deist (argued), Deputy Attorney General, San Francisco, California, for Respondent-Appellant.

Denis P. Riordan, Donald M. Horgan (argued), Riordan & Horgan, San Francisco, California, for Petitioner-Appellee.

**ORDER**

The opinion filed on February 18, 2016, and published at 815 F.3d 490, is hereby amended as follows:

On page 511, in the first full paragraph, remove the following sentence: <Even when a prosecutor relies on one impermissible reason for striking a juror, there is no *Batson* violation if "[t]he prosecutor provided a number of other permissible and plausible race-neutral reasons." *Collins*, 546 U.S. at 340–41.>.

With these amendments, the petition for rehearing en banc is **DENIED**. Judge O'Scannlain and Judge Ikuta voted to deny the petition for rehearing en banc and Judge Teilborg so recommended. The petition for rehearing en banc was circulated to the judges of the court, and no judge requested a vote for en banc consideration.

The petition for rehearing en banc is **DENIED**.  No further petitions for rehearing or rehearing en banc will be entertained.

---

**OPINION**

IKUTA, Circuit Judge:

This appeal raises the question whether the California Court of Appeal made an unreasonable determination of the facts in affirming the trial court's application of *Batson v. Kentucky*, 476 U.S. 79 (1986).  On trial for first degree murder of a police officer, Miguel Sifuentes challenged the prosecutor's decision to excuse nine black prospective jurors. The trial court concluded that Sifuentes had not carried his burden of showing the prosecutor acted in a purposefully discriminatory way, and the California Court of Appeal affirmed.  Applying the doubly deferential standard for reviewing a *Batson* determination, *see Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012), we conclude that the California Court of Appeal's decision was not based on an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d).  We also conclude that the trial court's decision to preclude Sifuentes from responding to the prosecutor's race-neutral explanation for his strikes was harmless.  We therefore reverse the district court's grant of habeas relief.

I

On December 11, 1998, Sifuentes, Ruben Vasquez, and Hai Minh Le robbed an Outback Steakhouse in Dublin, California.  Sifuentes entered the restaurant by himself, and

asked for a table. He told the server he was waiting for friends and ordered a soda. About a half hour later, when Sifuentes declined to place an order, he was presented with a bill. He told the server that he needed to get some money from his car, and headed for the exit.

As soon as Sifuentes approached the door, Vasquez and Le entered. Le pulled out a pellet gun and forced a departing customer to return to the restaurant. Sifuentes was also armed with a pellet gun. Brandishing their weapons, Vasquez, Sifuentes and Le spread out through the restaurant and forced the customers and employees into the kitchen. In the kitchen, Vasquez demanded money and fired his nine millimeter semiautomatic pistol into a fryer. The manager led Vasquez into his office, where Vasquez stuffed his pockets with money from the cash drawer. An employee managed to call 911, but had to hang up before reporting the robbery. When the restaurant phone rang, Vasquez ordered the manager to tell the police that everything was OK, or Vasquez would shoot him. The manager did as ordered. Then Vasquez, Sifuentes, and Le began forcing the employees and customers into the restaurant's walk-in refrigerator. Before being shut into the refrigerator, an employee activated a security device.

Deputy Sheriff Angela Schwab responded to the 911 call and went into the restaurant to confirm the manager's statement that there was no problem at the restaurant. Once she entered, she was surprised by Vasquez, who pointed his gun at her, hit her in the face, and took her gun. Le put a gun to her back, and he and Sifuentes walked her to the back of the restaurant. Sheriff Deputy John Monego arrived at the scene shortly thereafter. As he entered the restaurant, Vasquez shot him. Monego fell to the ground, and Vasquez

shot him multiple times where he lay, killing him. Vasquez, Sifuentes, and Le fled the scene and were apprehended shortly afterwards.

The three defendants were tried jointly. The prosecutor charged Sifuentes and Le with first degree felony murder. Cal. Penal Code § 189 (felony murder includes a murder that is committed by the defendant or an accomplice during the commission of a specified dangerous felony). During voir dire, the prosecutor focused on the potential jurors' views on the death penalty, and specifically whether they felt they could sentence a defendant to death if the defendant did not "actually commit the shooting." The prosecutor used peremptory strikes to remove thirty-three jurors, nine of whom were black. The empaneled jury included one black juror and one black alternate. The prosecutor stated for the record that he would have accepted a black female juror excused by the defense, as well as a black male juror, but that juror had failed to appear in court.

Sifuentes and his co-defendants made three objections during jury selection under *Batson v. Kentucky*, 476 U.S. 79 (1986), and the analogous California case, *People v. Wheeler*, 22 Cal. 3d 258 (1978), based on the prosecutor's use of peremptory challenges to remove nine black jurors.[1] After each *Batson* motion, the trial judge determined that the defendant had made a prima facie case of discrimination, and

---

[1] We refer to the motions as being made under *Batson*, although the defendants also relied on the analogous California case, *People v. Wheeler*, 22 Cal. 3d 258 (1978). Because it is the procedural equivalent of a *Batson* objection, a *Wheeler* motion serves as an implicit objection under *Batson*. *McDaniels v. Kirkland*, — F.3d —, 2015 WL 9461515, at *1 (9th Cir. Dec. 24, 2015) (en banc).

asked the prosecutor for an explanation. As explained in more detail below, after Sifuentes's first *Batson* motion, challenging the prosecutor's strike of Jackson, Norman, and Jasper, and second *Batson* motion, challenging the prosecutor's strike of Webster and Massey, the trial court did not permit defense counsel to respond to the prosecutor's explanation. The trial court did permit rebuttal for the third *Batson* motion, during which Thompson, Gibson, Barnes, and Skruggs were excluded. After each challenge, the court determined that the prosecutor's reasons for excusing each juror were race neutral and not discriminatory.

Sifuentes and his two co-defendants were each convicted of first degree murder, and Sifuentes was sentenced to 26 years to life in prison. The California Court of Appeal affirmed his conviction in January 2006, and the California Supreme Court summarily denied review in May 2006. In 2007, Sifuentes petitioned for a writ of habeas corpus in federal court on several grounds, including that the state court unreasonably determined the facts in rejecting his *Batson* challenge to nine prospective jurors, and that the state court unreasonably applied Supreme Court precedent in precluding him from rebutting the prosecutor's explanation for his strikes. After a number of stays and refilings, the district court granted Sifuentes relief on his claim as to two jurors, Thompson and Gibson, and denied Sifuentes's other claims. The state timely appealed. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253.

## II

On appeal, the state claims that the district court erred in its analysis of Sifuentes's *Batson* claim with respect to jurors Thompson and Gibson. Sifuentes argues that the district

court did not err, and that, even if it did, the habeas petition should be granted because the peremptory strikes of six other jurors involved purposeful racial discrimination. Alternatively, Sifuentes argues that we can affirm the district court because the state court violated *Batson* in preventing him from rebutting the prosecutor's race-neutral explanations. Our analysis of these arguments requires an understanding of both the applicable *Batson* framework and the framework for evaluating a habeas petition under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254.

A

We begin with the applicable *Batson* framework. As *Batson* explains, "the State's privilege to strike individual jurors through peremptory challenges . . . is subject to the commands of the Equal Protection Clause," which "forbids the prosecutor to challenge potential jurors solely on account of their race." *Batson*, 476 U.S. at 89; *see also Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015). "[A]s in any case alleging a violation of the Equal Protection Clause," the key question is "whether the defendant had met his burden of proving purposeful discrimination on the part of the State." *Batson*, 476 U.S. at 90.

To answer that question, *Batson* adopted a burden-shifting approach similar to that used in other civil rights cases. *Id.* at 94 & n.18. First, the defendant must "make out a prima facie case of purposeful discrimination" by providing some evidence, such as the disproportionate exclusion of jurors of a certain race, that a peremptory challenge has been exercised on the basis of race. *Id.* at 93–94. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation" for striking the

juror. *Id.* at 97. "Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination" on the part of the prosecutor. *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003) (*Miller-El I*) (citing *Batson*, 476 U.S. at 98). "The opponent of the strike bears the burden of persuasion regarding racial motivation." *Ayala*, 135 S. Ct. at 2199.

The trial court's determination whether the prosecutor has intentionally discriminated "turn[s] on evaluation of credibility." *Batson*, 476 U.S. at 98 n.21. This type of credibility determination relies on the trial court's "evaluation of the prosecutor's state of mind based on demeanor and credibility," and is a "pure issue of fact" that lies "peculiarly within a trial judge's province." *Hernandez v. New York*, 500 U.S. 352, 364–65 (1991). Recognizing that "peremptory challenges are often the subjects of instinct, and that race-neutral reasons for peremptory challenges often invoke a juror's demeanor," the Court has explained that "[a] trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes." *Ayala*, 135 S. Ct. at 2201 (internal quotation marks and citations omitted). Determining "whether a peremptory challenge is based on an impermissible factor" is difficult, because peremptory challenges "are often based on subtle impressions and intangible factors." *Id*. at 2208. "[T]hese determinations of credibility and demeanor lie peculiarly within a trial judge's province," *id.* at 2201, because "a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Miller-El I*, 537 U.S. at 339; *see also Ayala*, 135 S. Ct. at 2201 ("Appellate judges cannot on the basis of a cold record easily second-guess a trial judge's

decision about likely motivation." (citing *Rice v. Collins*, 546 U.S. 333, 343 (2006) (Breyer, J., concurring))). On direct appeal, therefore, the reviewing court must uphold the trial court's credibility determination "unless it is clearly erroneous," *Felkner v. Jackson*, 562 U.S. 594, 598 (2011), meaning that the trial court's decision leaves the reviewing court with a "definite and firm conviction that a mistake has been committed," *Hernandez*, 500 U.S. at 370 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

On direct appeal, a reviewing court may evaluate the trial court's credibility finding by considering evidence indicating that the prosecutor's rationale was pretextual. An inference of pretext may arise when the prosecutor's reasons are not supported by the record, such as when a prosecutor "mischaracterizes a juror's testimony in a manner completely contrary to the juror's stated beliefs," *Aleman v. Uribe*, 723 F.3d 976, 982 (9th Cir. 2013), or when the reasons given by the prosecutor are implausible or fantastic, *Purkett v. Elem*, 514 U.S. 765, 768 (1995). In *Miller-El v. Dretke* (*Miller-El II*), the Court noted that when a prosecutor gives a race-neutral reason for striking a proposed juror, but has allowed jurors with similar characteristics to be empaneled, such inconsistent conduct raises the inference that the race-neutral reason is pretextual. 545 U.S. 231, 241 (2005). Under this comparative juror analysis, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Id*.

The Supreme Court has not created any bright line rule holding that *Batson* is necessarily violated when "prospective jurors of different races provide similar responses and one is

excused while the other is not." *See Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994). Rather, the Court recognized that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial." *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008). A trial court can reasonably conclude that the prosecutor had excused a prospective juror based on the prosecutor's assessment of that person's credibility "tak[ing] into account tone, demeanor, facial expression, emphasis—all those factors that make the words uttered by the prospective juror convincing or not." *Burks*, 27 F.3d at 1429. Similarly, a trial court can reasonably credit a prosecutor's reasons when there is some evidence of sincerity, such as that the prosecutor "did not know which jurors were Latinos," *Hernandez*, 500 U.S. at 369–70, or that "the prosecutor did accept minorities on the jury," *Burks*, 27 F.3d at 1429. In short, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Hernandez*, 500 U.S. at 369 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

As the Supreme Court has explained, this is the standard on direct review; on federal habeas review, the standard is even more deferential. *Felkner*, 562 U.S. at 598; *see also Ayala*, 135 S. Ct. at 2199 ("Under AEDPA, even more must be shown.").

B

Because we are not reviewing the California Court of Appeal's decision directly, but through the lens of collateral review, we now turn to our standard for reviewing state court decisions under AEDPA, which "imposes a highly deferential

standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner*, 562 U.S. at 598 (internal quotation marks omitted).

We first delineate the standard of review for this collateral challenge to the state court's decision. Because the district court's determination whether the prosecutor's strikes were purposefully discriminatory is a "pure issue of fact," AEDPA § 2254(d)(2) applies.[2] *Hernandez*, 500 U.S. at 365–66. That section precludes a federal court from granting habeas relief to "a person in custody pursuant to the judgment of a State court . . . with respect to any claim that was adjudicated on the merits in State court proceedings" unless that state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In considering a state court's *Batson* determination, "[a] federal habeas court must accept a state court finding unless it was based on an unreasonable

---

[2] 28 U.S.C. § 2254(d) states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

determination of the facts in light of the evidence presented in the State court proceeding." *Ayala*, 135 S. Ct. at 2199 (internal quotation marks omitted) (citing 28 U.S.C. § 2254(d)(2)). As we have explained this standard, "a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004); *see also Miller-El I*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."). And "[s]tate-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Ayala*, 135 S. Ct. at 2199–2200 (quoting *Collins*, 546 U.S. at 338–39, citing 28 U.S.C. § 2254(e)(1)).[3] "The

---

[3] 28 U.S.C. § 2254(e) states that, in a habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." In the context of deciding *Batson* claims, the Supreme Court has noted that "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary," *Miller-El I*, 537 U.S. at 340. The Supreme Court's most recent word on this subject, *Davis v. Ayala*, affirms the applicability of the presumption in § 2254(e). 235 S. Ct. at 2199–2200. The Court has previously indicated, however, that it is an open question whether this presumption is applicable, *see Collins*, 546 U.S. at 339; *see also Wood v. Allen*, 558 U.S. 290, 300–01 (2010). In an abundance of caution, and "because our view of the reasonableness of the state court's factual determination in this case does not turn on any interpretive difference regarding the relationship between these provisions," *Wood v. Allen*, 558 U.S. at 300, we review the state court's findings under the standard established in § 2254(d)(2).

upshot is that even if reasonable minds reviewing the record might disagree about the prosecutor's credibility, on habeas review that does not suffice to supersede the trial court's credibility determination." *Ayala*, 135 S. Ct. at 2201 (internal quotation marks and alterations omitted) (citing *Collins*, 546 U.S. at 341–42).

When we apply this deferential AEDPA standard in the *Batson* context, we end up with a standard of review that is "doubly deferential," *Briggs*, 682 F.3d at 1170, because the federal court defers to the state reviewing court's determination of the facts, and the reviewing court defers to the trial court's determination of the prosecutor's credibility. This doubly deferential standard means that "unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it." *Id.* at 1170.

We apply this doubly deferential standard in two steps. *Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013). First, because § 2254(d)(2) ultimately requires us to determine whether the state court's decision was "based on an unreasonable determination of the facts in light of the evidence" in the record, we must review the relevant portions of the record and use ordinary analytic tools to evaluate the prosecutor's race-neutral explanations. *Mitleider v. Hall*, 391 F.3d 1039, 1046–47 (9th Cir. 2004). We consider whether a prosecutor's justifications are contrary to the evidence in the record, such as being "implausible or fantastic," *Purkett*, 514 U.S. at 768, based on mischaracterizations of a prospective juror's testimony, *Miller-El II*, 545 U.S. at 244, or belied by a comparative juror

analysis.[4]  Conversely, we consider whether evidence in the record shows that at least some of the prosecutor's reasons were "permissible and plausible." *Collins*, 546 U.S. at 341.

Second, having reviewed the prosecutor's explanations in light of the evidence in the record, we turn to the state appellate court's decision.  The pertinent question is not whether the prosecutor was credible, or even whether the trial court's conclusion to that effect was clearly erroneous. Rather, the pertinent question is whether the state appellate court was objectively unreasonable in upholding the trial court's determination.  Even if we would have reached a different conclusion regarding the prosecutor's credibility, we must give the state appellate court the benefit of the doubt, *Felkner*, 562 U.S. at 598, and may not grant the habeas petition unless the state court's decision was "not merely wrong, but actually unreasonable." *Taylor*, 366 F.3d at 999.

### III

We now apply these principles in determining whether the California Court of Appeal's affirmance of the trial court's determination that the prosecutor's justifications were not purposefully discriminatory was objectively unreasonable. As noted above, the district court granted Sifuentes relief with respect to Thompson and Gibson, but not as to the other six jurors.

---

[4] We must conduct a comparative juror analysis in the first instance if the state reviewing court has not done so. *Jamerson*, 713 F.3d at 1225.

### A

We begin by reviewing the relevant portions of the record as to Thompson. Thompson stated in his juror questionnaire that he was active in the Baptist faith, but that his religious beliefs would not interfere with his ability to serve as a juror. He stated that he volunteered in his church's food programs weekly. Where the questionnaire asked whether he could follow the law, Thompson answered "yes," explaining that "[t]he laws [were] made to govern the land. Our job is to obey those laws." When it asked for his general feelings about the death penalty, he stated "[i]t's there as a tool . . . [b]ut not to be exploited." When it asked him to rank his views of the death penalty on a five-step scale from "strongly in favor" to "strongly against," he chose "moderately in favor." He also stated that his views about the penalty had not changed in the last few years, and that he would vote to retain the death penalty if it were on the ballot in California.

At voir dire, the trial judge asked Thompson to state whether he was able to impose the death penalty as "a philosophical question." He responded:

> I guess you could say it's a gray-line answer there. I've always been taught to obey the laws of the land, and because this is the land that I live in, yes, I would have to, I guess, obey at that particular time. But I guess, yes, depending on the circumstances.

The trial judge followed up on this inquiry, asking whether Thompson could ever vote to execute somebody "if [he] felt it was appropriate." Thompson responded, "Yeah, I could."

The prosecutor's first question targeted Thompson's response that he was "taught to obey the laws of the land," asking: "You said to the judge that you were taught to follow the law.  Could you elaborate a little bit about what kind of upbringing you had that led you to that?"  Thompson responded:

> Well, I am a minister, I am faith based, I am a Christian, and in some religious aspects, they try to tell you that you are not supposed to judge anyone, that we don't have the right to judge anyone, but at the same time, you are also taught to obey the laws of the land.  So basically I can't hold judgment on anyone, but at the same time I do have to hold to account what the laws of the land are.

Following up on Thompson's explanation of his faith, the prosecutor asked whether he heard correctly that Thompson was a minister in his religion, and Thompson replied that he was.  The prosecutor then confirmed Thompson's statement "that your religious beliefs teach you to not judge other people," and Thompson responded: "Right. But at the same time, it also teaches us to obey the laws of the land.  What I mean by not judge people, the Bible says that you are not to judge one another, but at the same time it tells you in there to obey the laws of the land."  The prosecutor asked whether Thompson's religious beliefs would make this case a difficult problem for him, and Thompson responded that it would not. The prosecutor then asked: "Why not?  If your religious beliefs tell you not to judge people and you're going to be placed in a moral position to make a judgment about somebody, I'm trying to reconcile those two."  Thompson responded:

> Well, the reconciliation is the fact that it's my
> job to carry out the laws of the land. Okay?
> No, I can't per se condemn someone, because
> everyone has shortfalls, everyone has things
> they have done in their past or whatever. I
> can't just say you're a bad person just because
> you did this, that, that. What I'm saying is
> that even after everything is taken into
> account, the laws of the land still prevail.

The trial judge then observed that this seemed like a situation that the Bible describes as "render unto Caesar that which is Caesar's, render unto God that which is God's," with this being a case where Caesar's rules applied, and Thompson replied, "Exactly."

Next, the prosecutor questioned Thompson on his views regarding the felony murder rule, describing the facts of this case and asking how Thompson felt about two of the defendants being charged with murder for their participation in a robbery in which someone was killed, even though they did not kill anyone. Thompson responded: "That's just the law. That's being an accessory to a crime. I mean, I might not have robbed a bank, as an example, but I was with someone who did rob a bank, so I'm just as guilty as that individual." The prosecutor asked more specifically: "How do you feel about that principle, just as a person? Not as a—as something that's part of the law, but just you as a person and knowing your background as a minister in your religion, that sort of thing." Thompson answered:

> Well, the principle in itself, I mean, should I
> be held accountable, should I be—how should
> I put it?—lumped in or grouped with someone

who does something wrong. Well, if I know the individual, I'm caught, I'm caught. I mean, the principle is basically what it is. It's really not how I feel about it. It's not like it's either right or either wrong. The fact is I was somewhere where I shouldn't have been.

The prosecutor tried again, explaining the felony murder rule and asking:

Q. Knowing who you are based on your philosophical beliefs, your religious beliefs, your ethical beliefs, do you think that the death penalty is a viable option for somebody who actually didn't do any killing?

A. It depends on the preponderance of the evidence, it depends on the special circumstances at the time, it depends on the evidence that's presented. Right now, just saying that one person shot another individual and the other two people were in another area of the restaurant or whatever, it's hard to say that those individuals would be eligible for it, but at that particular time, after listening to all the evidence, they may all three be eligible for it. It all depends on what actually was going on in the restaurant.

THE COURT: You haven't eliminated the death penalty with respect to the guys that didn't kill anybody.

A: Right.

The prosecutor attempted one final confirmation:

> Q.  The special circumstance that you
> would have found as to those two defendants
> would have made them eligible for the death
> penalty or life in prison without the possibility
> of parole because they were major participants
> and they were involved in reckless
> indifference to human life during the course
> of that crime. Okay?
>
> A. Um-hum.
>
> Q. They don't have to have an intent to
> kill anybody. In fact, as the factual scenario
> indicates, they didn't kill anybody.
>
> A. Um-hum.
>
> Q. Knowing that, do you think it's
> reasonable that—or is the death penalty still
> on the table in terms of a realistic option for
> two of these defendants who didn't kill
> anybody, who actually did not fire the gun?
>
> A. Yes, because it was accessory to a
> crime.

The defense asked no questions, and the court found
Thompson qualified to serve.  The judge later denied a
challenge for cause.

Sifuentes brought a *Batson* challenge after Thompson and
three other black jurors (Gibson, Barnes and Skruggs) were

excused.  The trial court held that Sifuentes had made a prima facie case, and thus the burden shifted to the prosecutor to justify the strikes of those four jurors.

The prosecutor provided two reasons for striking Thompson: his views of the death penalty and his religious beliefs.  The prosecutor explained his reasoning:

> [Thompson] was the one who was active in his Baptist church, involved in church programs weekly, and he expressed extreme reservations about the death penalty.

> There was a question asked: "Could you do something like that?" Page 7386: "I guess you could say it's a gray-line answer there. I've always been taught to obey the law."

> And then he says he's equivocal.  He was talking about his duty.  He understands his duty.  And I think he was confusing duty with how he felt about these penalties: "Well, because it's the law, I can do my duty."  But that didn't mean he could impose the death penalty.

> He also said at 7397 that he was a minister, and he said, "So basically I can't hold judgment on anyone.  But I do have to hold account to the laws of the land."

> So he said because of his religious beliefs, he wasn't in a position to make a judgment on anybody, and he repeated that several times.

THE COURT: How about the next one?

MR. GOODFELLOW: At 7398, he also said, "I can't say you're a bad person." And then the judge: "Okay."

I asked him a lot of questions, and he never really would answer the questions about how do you feel about that principle. He kept talking about duty, but he would never answer the questions. He avoided answering any questions about what he felt about them personally. He kept going back to his duty.

And based upon that, there were no questions by the defense, obviously, because they knew he was never going to come to death, it was so obvious. He wasn't facing the issue.

So based on everything in his questionnaire and all of the answers that he gave in court and his demeanor in terms of being unable to really answer the questions and being evasive to the types of tough questions I was asking him about putting himself in that position, it's clear to me he couldn't impose the death penalty on anybody.

And besides that, I had many more better jurors after him that were much more pro-death-penalty. And I'm trying to get a pro-death-penalty jury.

The trial court found that the prosecutor's reasons for striking Thompson and the other three jurors "were racially neutral and that they were valid, there was justification, there's a good, cogent reason to excuse every one of these jurors, and that they were facially neutral." The California Court of Appeal upheld this determination based on the prosecutor's explanation of his concerns, namely that Thompson was active in the Baptist church and gave "equivocal" responses regarding the death penalty. The California Court of Appeal did not conduct a comparative juror analysis.

In evaluating the California Court of Appeal's conclusion, we begin by reviewing the record. First, the prosecutor's characterization of Thompson's statements was not contrary to the evidence. Thompson testified that he was a Baptist minister, and he stated that his religion taught him not to judge others but that he could "obey the laws of the land." The record also shows that Thompson's statements regarding his willingness to impose the death penalty could be characterized as equivocal, because he consistently couched his ability to impose the death penalty in terms of his duty to obey the law. The prosecutor's concern that a Baptist minister who gave equivocal answers about the death penalty and qualified his views with his understanding of the law might be hesitant to impose the death penalty in a felony murder case was not "implausible or fantastic." *See Purkett*, 514 U.S. at 768.

Because the California Court of Appeal did not conduct a comparative juror analysis, we conduct this analysis in the first instance to determine if it gives rise to an inference that the prosecutor's reasons were pretextual. *Jamerson*, 713 F.3d at 1225. As the district court pointed out, the seated jurors

had some characteristics similar to Thompson regarding their willingness to impose the death penalty. Thompson's juror questionnaire responses and his voir dire statements showed that he had not eliminated the possibility of imposing the death penalty on non-shooters. His questionnaire response also indicated that he was "moderately in favor" of the death penalty. This statement was more favorable toward the death penalty than seven of the seventeen selected jurors (including those seated and alternates), all seven of whom stated that they were "neutral" toward the death penalty. The other ten selected jurors stated either that they were "moderately in favor" or "strongly in favor" of the death penalty. The two black jurors that were selected reported that they were "neutral" toward the death penalty. Additionally, during voir dire, eight of the selected jurors expressed some level of uncertainty regarding whether they could impose the death penalty on a non-shooter.

Nevertheless, the seated jurors were distinguishable from Thompson in several key ways. The record shows that the jurors who initially responded equivocally regarding the death penalty later stated unequivocally that they could impose the death penalty. For example, Juror 1's first answer was: "Under certain circumstances, I believe I could" vote to execute someone. The juror later stated definitively, "Oh, yes, I could, yeah," when asked whether the juror could impose the death penalty. Similarly, Juror 2 first stated: "I've never—I've never been in that situation. I guess the only way I can answer that question is I would have to listen to all of the facts. . . ." Each time the court or prosecutor subsequently asked if Juror 2 could impose the death penalty, including when the prosecutor confronted the juror with the earlier statement that the juror had not thought about it before, Juror 2 unequivocally responded "yes."

Moreover, the seated jurors expressed their personal willingness to impose the death penalty in an appropriate case. For example, when asked, "Knowing who you are, do you think that you are capable of making that call even if it happens to be the death penalty, the hard call?" Juror 1 responded, "Oh, yes, I do." Juror 11 stated, "['I believe so'] means that if I feel that—after hearing the evidence, that I believe that I could, in fact, vote for a death penalty." Juror 12 stated, "Just personally I think I would probably lean more towards the death penalty, but I can't say that I completely eliminated life without the possibility of parole." And Alternate Juror 2 stated, "If I feel the death penalty is warranted by the action, I would vote for it."

By contrast, Thompson avoided expressing his personal views and couched his answers to similar questions in terms of objective legal requirements. For instance, when repeatedly asked by the prosecutor how he felt as a person on the topic, Thompson gave answers like: "I can't hold judgment on anyone, but at the same time I do have to hold to account what the laws of the land are," and "I mean, the principle is basically what it is. It's really not how I feel about it."

Some of the seated jurors also had characteristics similar to Thompson regarding their religious faith. Four of the seated jurors identified themselves as Catholic and two other jurors discussed their religious beliefs. In addition, the record shows that the prosecutor asked Thompson more questions about religion than other prospective jurors. The prosecutor did not ask the four Catholic jurors, or a prospective Catholic juror (later excused by one of the defendants), about whether their religious beliefs affected their attitudes about the death penalty. The prosecutor briefly questioned two other

prospective jurors, both of whom were black, about their religious beliefs. Thompson differed from these prospective jurors in that he identified himself as a minister in his faith and made equivocal remarks about the effect of his faith on imposing the death penalty. None of the seated jurors expressed Thompson's sentiment that his religion forbade him from judging others, but he could nevertheless follow the law.

Reading the voir dire transcript as a whole, the prosecutor made persistent efforts to draw out Thompson's personal views about imposing the death penalty. The prosecutor's explanation for the strike indicates his concern about Thompson's nonresponsive answers, and his conclusion that Thompson would not actually vote for the death penalty.

Having conducted this review of the record, we now turn to the state appellate court's ruling. The California Court of Appeal concluded that the trial court properly deemed the prosecutor's reasons regarding Thompson's religious activity and equivocal responses regarding the death penalty credible. Applying our doubly deferential standard, and giving the state court the benefit of the doubt, this is not an objectively unreasonable determination of the facts.

On the one hand, the record reflects that the seated jurors had some similarities to Thompson, and Sifuentes does not need to show "there is an exactly identical white juror" to prevail on a *Batson* challenge. *Miller-El II*, 545 U.S. at 291.

But the record also shows material differences regarding Thompson's persistent equivocation about his willingness to impose the death penalty. Although Sifuentes argues that the prosecutor's failure to question other jurors about their

religious beliefs as persistently raises the inference that his concerns about Thompson's faith were pretextual, the record reasonably supports a conclusion that the prosecutor's key concern was Thompson's couching his views on the death penalty in terms of following the law.

Based on our review of the voir dire transcript, the trial court could have reasonably concluded that the prosecutor did not believe that Thompson would actually impose the death penalty, "tak[ing] into account tone, demeanor, facial expression, emphasis—all those factors that make the words uttered by the prospective juror convincing or not." *Burks*, 27 F.3d at 1429. Ambiguity as to whether a juror would be able to give appropriate consideration to imposing the death penalty is a legitimate and reasonable basis for striking a juror. *White v. Wheeler*, 577 U.S. ___, 136 S. Ct. 456, 461 (2015). Even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility," this is an insufficient basis for habeas relief. *See Jamerson*, 713 F.3d at 1224.

The state appellate court therefore did not unreasonably determine that the trial court's credibility finding was supported by substantial evidence, so no habeas relief is warranted on the basis of the prosecution's peremptory challenge of Thompson. *See Briggs*, 682 F.3d at 1170. In holding otherwise, the district court failed to apply the doubly deferential standard, and therefore we reverse on this point.

B

We now review the relevant portions of the record with respect to juror Gibson. Gibson's juror questionnaire stated that she was 49 years old, had a 33-year-old son, and had

been a substitute teacher from 1992 to 1995. It also reported that she had gone to law school and was a member of the California bar, although she had never practiced. She also stated that she had applied to work at a DA's office after law school but had not been hired. When asked her views of the criminal justice system, she stated "I believe the criminal justice system serves us; however, it could improve." Her brother, her son, her brothers-in-law, and her cousins had served time in prison. Gibson also stated that she was "moderately in favor" of the death penalty, would vote to retain it in an election, and believed that "the death penalty has its place in the penal system." She explained that she had "a better understanding and appreciation for the death penalty than [she] did when [she] was younger."

During voir dire, the prosecutor asked whether Gibson felt this case was serious enough to warrant the death penalty. She responded, "I think I could consider that as an option. I don't know if I could impose it without going through the whole experience of the trial."

The prosecutor's questions regarding why her views of the death penalty had changed gave rise to the following exchange:

> A. Well, I never thought that the death penalty should be a viable option, because I didn't think that anyone had that right or authority to impose that upon another person, even though someone could murder a person and, in essence, that's the death penalty. But for a jury to then turn around and decide that the defendant should die, I never thought that was quite right.

So, you probably want to know what's changed.

Q.  Yeah.

A.  Really what's changed is that I'm actually a Christian and Christian principles, the death penalty is a viable option.  And so I would say that's really what changed my views.

Defense counsel later followed up on this issue, and asked her "what about [her] Christian philosophy has now allowed [her] to allow for the death penalty."

A.  Well, Christianity allows for—to have two or three witnesses.  So, if you have the evidence and you have witnesses, then you can really consider it, consider the punishment.

Q.  Uh-huh.

A.  But, even before I was born again, my views had started changing on the death penalty.

Q.  Politically or philosophically or just religiously?

A.  Well, if we have to put a label on it, I would probably say I just became more conservative as I got older.

Q.  All right.

A.    And had a better idea of—or a different understanding of why we have these kind of laws.

Q.  Okay.  When you say that—and I got the impression that you're not ascribing to the eye for an eye of the Old Testament.  When you say if you have two or three witnesses, that can allow for the option of the death penalty, what does that mean?

A.    Well, an eye for an eye is more revenge.

Q.  Exactly.

A.  And so we're not really talking about revenge.  But I think when the judge was questioning me also, what I said was Christians were supposed to follow the law.

Q.  Uh-huh.

A.  And so, if the law allows for a death penalty, and our law allows for the death penalty, and we have witnesses to prove that—

Q.  An act?

A.  An act and the guilt and go through all of that, then I don't have any adversity to imposing the death penalty.

Q.  Okay.  That's where I'm at right now with you.

Now, because of that religious belief, it allows you to consider it.

A.  Yes.

Q.  Does it tell you that if you get to that point that you have to impose it?

A.  No.

Q.  Okay.  So, basically you get to that point, then it is not an eye for an eye, but it's an option?

A.  It's an option because the law allows it and so the law also allows life without parole.

The prosecutor also asked about her views of the felony murder rule and whether she had any "philosophical beliefs about that concept."

A.  Well, not philosophically.  What I believe is that if the law is on the books, then that's what we have to go by.  And if it needs to change, then that's up to the legislature.

But if that's the law, then that's what we have to apply and follow.

Q.  Okay.  If you were in charge, would we have that kind of a law?

A.  Well, that, you know, I don't know.  I never aspired to be a legislator, so I don't know.  I mean I can't tell you.

You're asking me if I agree with the law?

Q.  If you agree with the concept that somebody could be—

A.  Well I mean I can see—I can understand why we would have that type of a law.  If you know that you're doing something that is so dangerous that, you know, you could kill someone, then you should be responsible if someone dies.  I mean I can understand the law.  So I can't say that I have a philosophical difference with it.

Q.  Okay.  I mean but I'm not sure that—do you think that concept is a fair concept?

A.  I understand the concept.  I don't say it's unfair, so—

The trial court then asked her whether she could follow the law if selected as a juror, and she stated she could.  She also

stated that the death penalty was an option for her in an appropriate case.

Next, the prosecutor asked about her background, including her application to work at the DA's office and her family members that had been in prison. When asked whether her brother had been treated fairly, she said "Probably he was treated fairly, based on, you know, the little bit I knew about it." She said the same of her son's treatment.

The prosecutor provided six reasons for striking Gibson:

Gibson, she was a 49-year-old lawyer working for SBC. She has a son who is 33, so she had a son when she was 16. I find that a problem. She was a school teacher in 1992 to 1995, indicates fairly liberal. She has a doctorate; she's a lawyer. I don't want a lawyer on my jury. I've never liked having lawyers on juries. They're know-it-alls, they inject themselves into the case, they think they can do a better job.

She said with respect to the criminal justice system, "It serves us. However, it could improve."

In addition, page 7, she had numerous relatives that have served time in the penitentiary. In the late '60s, her [brother] served time in Santa Rita, brother-in-law and cousins who also served time. A lot of the criminal element in her family. I just can't

have somebody on my jury that has those
kinds of problems.

The trial judge then noted that in a recent Los Angeles case,
a jury verdict had been overturned because there were
allegations that a lawyer on the jury "sort of took over the
jury and was making false representations as to the law . . . so
that's always a problem with a lawyer upstairs." The
prosecutor responded, "It is a problem. That's precisely why
I don't want lawyers on my juries." The prosecutor
continued:

> At page 6992, she said when she was
> younger she never thought the death penalty
> should be an available option because she
> didn't think that anyone had the right or
> authority to impose death. She also said that
> she was–6993–a born-again Christian and her
> Christian beliefs would influence the way she
> thinks.

> When asked about the felony murder rule,
> she wouldn't directly answer the question
> about how she felt about it; she dodged it.

> Page 7005, she went back to Christian
> beliefs: you have to have two to three
> witnesses, then you can consider punishment.
> I emphasize the word "consider." That
> doesn't mean it's really on the table,
> especially given her other answers.

> THE COURT: Okay. I think I've heard
> enough.

The trial court held that all of the prosecutor's justifications were "racially neutral and . . . valid" and were "good, cogent reason[s]."

We evaluate the prosecutor's race-neutral explanation in light of the evidence in the record.  The prosecutor's statements that Gibson was a single mother, had a legal education, was a school teacher and had relatives with criminal histories are all consistent with the record.  Given Gibson's statements that she had earlier opposed the death penalty but had changed her mind after becoming a born again Christian based on her reading of the Bible, her views that the Bible required two or three witnesses before imposing the death penalty, and her nonresponsive answers to questions regarding her position on the felony-murder rule, the prosecutor's statement that Gibson's Christian beliefs might affect her decision on the death penalty are supported by the record.

The California Court of Appeal conducted a comparative juror analysis, and determined that, unlike Gibson, none of the seated jurors had attended law school.  Although several of the seated jurors had relatives with prior criminal histories, none had multiple relatives with criminal histories, as did Gibson.  Finally, none of the seated jurors expressed concerns with the death penalty or qualified their willingness to apply the death penalty, as did Gibson with the requirement that there be "two or three witnesses."  Based on our review of the voir dire testimony, the California Court of Appeal's comparative juror analysis was not an unreasonable determination of the facts.

We now turn to the state appellate court's ruling.  The California Court of Appeal upheld the trial court's

determination based on the prosecutor's explanation of his concern: (i) that Gibson's Christian beliefs and statement that she could consider the death penalty on the evidence of two or three witnesses could impact her decision whether to impose the death penalty; (ii) that Gibson's legal training would cause problems, based on the prosecutor's experience with lawyers on juries; and (iii) that Gibson had numerous relatives with criminal histories.

The California Court of Appeal's determination that the trial court properly assessed the credibility of the prosecutor's statements regarding Gibson was not objectively unreasonable. *Briggs*, 682 F.3d at 1170. Rather than expressing straightforward personal views about imposing the death penalty, Gibson provided an unusual faith-based explanation that she had overcome her prior opposition to the death penalty when she became a Christian, because Christians could consider imposing the death penalty on the evidence of "two or three witnesses." The prosecutor could have reasonably believed that such responses made Gibson appear unpredictable and raised the question whether Gibson would require evidence (such as eyewitness statements) beyond what the law requires before considering a vote for the death penalty. Accordingly, it was not unreasonable for the state court of appeal to conclude that the prosecutor was genuinely "uncomfortable" with Gibson's responses.

The state court could reasonably determine that the prosecutor's explanation that Gibson's legal training would cause problems, based on the prosecutor's experience with lawyers on juries, was not pretextual. Sifuentes argues that the prosecutor's willingness to accept two other highly educated jurors (an MIT graduate and a person with undergraduate legal training) shows that the prosecutor's

concerns with Gibson's legal training were pretext. He also points out that she had never actually practiced law. But unlike Gibson, the two seated jurors had not graduated from law school or become members of the bar, and while Gibson never practiced law, the prosecutor may have reasonably been concerned that a person with legal training would exhibit the behaviors on a jury that the prosecutor feared.

The state court also held that the prosecutor's explanation that Gibson had numerous relatives with a criminal history was not pretextual. Sifuentes argues that the fact that the prosecutor retained white jurors who had family members with criminal histories demonstrates his dismissal of Gibson for the same reason was pretext. But even though the white jurors had closely related family members who had committed grave crimes, none of the seated jurors had multiple family members with criminal backgrounds, and therefore the trial court could determine that the prosecutor's greater concern regarding Gibson's view of the criminal justice system was genuine.

Sifuentes argues that the weakness of the prosecutor's other reasons, such as the prosecutor's explanation that Gibson had been a single mother and a school teacher, were so weak that they raise the inference that the prosecutor struck her on discriminatory grounds. We disagree. There is no evidence the prosecutor viewed white single mothers differently from black ones. None of these less persuasive reasons is discriminatory and there is no evidence that these less persuasive reasons "motivated in substantial part" the prosecutor's decision. *See Cook v. LaMarque*, 593 F.3d 810, 815 (9th Cir. 2010) (quoting *Snyder*, 552 U.S. at 485); *Collins*, 546 U.S. at 340–41. Applying our doubly deferential standard, the California Court of Appeal's conclusion that the

trial court properly assessed the credibility of the prosecutor's statements as to Gibson was not objectively unreasonable. The district court erred in holding otherwise.

C

Because we can affirm the trial court on any basis supported by the record, *see Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005), Sifuentes argues that even if we disagree with the district court's rulings regarding Thompson and Gibson, we should affirm the district court's grant of the habeas petition on the ground that the state appellate court unreasonably determined the facts in upholding the trial court's *Batson* determination with regard to six other jurors. We consider each of the jurors in turn.

1. We first consider juror Jackson. A review of the record shows that Jackson expressed concerns about the death penalty. In his questionnaire, he stated that he was not sure if he would vote for the death penalty, stating, "[a]s more [and] more new methods of investigation show the old flaws, I am becoming less inclined toward it." During voir dire, he stated that he would be hesitant to impose the death penalty because he doubted the fairness of the criminal justice system. In striking Jackson, the prosecutor referred to Jackson as a "resident of Berkeley, . . . a hotbed of anti-death-penalty people." The prosecutor also expressed concern that Jackson had "problems with the system with respect to the fairness of the death penalty"; for instance, he stated "'I don't know if I can consciously end someone's life.'" The trial court concluded that the prosecutor's race-neutral reasons for striking Jackson were credible. The California Court of Appeal conducted a comparative juror analysis. Based on its comparison of seated jurors, the state court rejected

Sifuentes's argument that the prosecutor's explanations for striking Sifuentes were pretextual because other seated jurors lived in Berkeley and expressed similar concerns about the death penalty.

We now evaluate the prosecutor's race-neutral explanations in light of the evidence in the record. The prosecutor's characterization of Jackson's statements as showing reluctance to impose the death penalty was not contrary to the evidence. However, the prosecutor's belief that Jackson lived in Berkeley and that he said "I don't know if I can consciously end someone's life" was an error: those were true about juror Jasper, not Jackson. Sifuentes argues that the prosecutor's mistaken attribution of statements to Jackson that were made by another black juror demonstrates the prosecutor's bias. While a prosecutor's credibility may be questioned if the prosecutor "mischaracterizes a juror's testimony in a manner completely contrary to the juror's stated beliefs," a prosecutor's "mistake in good faith, such as an innocent transposition of juror information," does not support a finding that the prosecutor is not credible. *Aleman*, 723 F.3d at 982. Here, the state court found that the prosecutor's error in attributing Jasper's statements to Jackson's was a "mistake in good faith," because Jackson expressed similar reservations. Based on our review of the record, this conclusion was not an unreasonable determination of the facts. Accordingly, applying our doubly deferential standard, and giving the state court the benefit of the doubt, the California Court of Appeal's conclusion that the prosecutor was credible is not an objectively unreasonable determination of the facts.

2.  Based on our review of the record, Juror Norman expressed both religious and personal qualms with the death

penalty, including stating that he was against it "for the most part" and would eliminate it in California if given the choice. He also stated that he could impose it as part of his "duty," or "if [he] had to, yes," prompting the court to step in several times to make sure he was actually eligible to serve as a juror in a death penalty case. The record also shows that Norman failed to appear in court twice. The prosecutor's characterization of Norman's statements, and his failure to appear on two occasions, were not contrary to the evidence. The California Court of Appeal did not conduct a comparative juror analysis. Conducting this analysis in the first instance, we conclude that none of the seated jurors expressed the serious concerns about the death penalty stated by Norman; none of the seated jurors stated that they would have voted against retaining the death penalty if it were on the ballot; and none of the seated jurors failed to appear.

Sifuentes argues that Norman was a probation supervisor and, from some of the trial court's questions, there appeared to be initial concerns that he would be sympathetic to the prosecution. He acknowledges that Norman expressed several times his negative views of the death penalty, but points out that Norman also responded he could impose the penalty if warranted. Norman's significant qualms about imposing the death penalty do not suggest the strike was pretextual, or that the trial judge and state appellate court were objectively unreasonable in accepting the prosecutor's justification. Thus, applying our doubly deferential standard, the California Court of Appeal's determination that the trial court did not err in concluding that the prosecutor's reasons for striking Norman were genuine was not an unreasonable determination of the facts.

3.    The record shows that prospective juror Jasper expressed significant reservations about the death penalty. She stated that "I don't know if I can consciously end someone's life" and "I don't know if I could live with thinking I've basically killed this person.  That's pretty tough."  When the trial judge questioned her, she said she had mixed feelings but could impose the death penalty "[i]f it's justifiable."  Jasper also stated that she believed the criminal justice system "is biased toward those who do not have enough money to pay for a decent lawyer," and that her brother's friend had been charged with murder.  Jasper also stated that she could serve as a juror without risking her job, and her employer's request that she be allowed a postponement because of a co-worker's maternity leave "really doesn't matter for me."

In explaining his reasons for striking Jasper, the prosecutor expressed concerns about her "mixed feelings on whether or not killing someone is the right thing to do," about her remarks that the criminal justice system is biased, and that her familiarity with her brother's friend who was charged with murder would interfere with her ability to sit in a murder case.  The prosecutor also remarked on the fact that she was a single mother with a six year old who came to court wearing leather pants.  The prosecutor further noted Jasper's remark about her co-worker's maternity leave, and stated his view that she was not concerned about hardship to her employer.  Finally, he stated that Jasper was not friendly to him.

The California Court of Appeal conducted a comparative juror analysis regarding Jasper's views on the death penalty and criminal justice system, and determined that her statements were more negative than Thompson and Gibson,

and that none of the seated jurors identified by Sifuentes knew someone who was charged with murder. Based on our independent review of the record, the state court's conclusions are not an unreasonable determination of the facts in the record. Nor did the prosecutor otherwise misstate the evidence.

Sifuentes argues that the record shows that the prosecutor's reasons for striking Jasper were pretextual. He claims that the prosecutor's reference to her single-mother status and attire showed that the prosecutor stereotyped black women and relied on reasons unrelated to the case. Sifuentes also argues that the record does not reflect Jasper's lack of interest in a career.

Although the explanations based on Jasper's appearance and personal characteristics are not persuasive, they are race neutral on their face. The trial court could reasonably determine that there was no *Batson* violation because "[t]he prosecutor provided a number of other permissible and plausible race-neutral reasons." *Collins*, 546 U.S. at 340–41. Finally, Sifuentes notes that the trial court made no findings that Jasper had an unfriendly demeanor. But there is no clearly established Supreme Court rule that "a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor." *Thaler v. Haynes*, 559 U.S. 43, 48 (2010). Applying our doubly deferential standard, the state appellate court's conclusion that the trial court did not err in crediting the prosecutor's reasons was not an unreasonable determination of the facts.

4. The relevant portions of the record show that juror Webster expressed opposition to the death penalty. He stated in his questionnaire that "I hope some day it will be

considered uncivilized," and that he would vote against it if it were on the ballot. During voir dire, he said that he might be willing to impose the death penalty for people like "Charlie Manson," but that it would be "very difficult" for him to do so. When asked how he felt about the death penalty "on a scale of 1 to 10, between Mother Theresa and Rambo," he responded "Oh. 7." In response to the court's questioning, Webster stated that "it's unlikely" he would vote to execute non-shooters, but that he'd "like to think it's not impossible." The trial judge denied a challenge for cause.

In explaining why he struck Webster, the prosecutor expressed concern that Webster generally opposed the death penalty and would be unlikely to vote for it. He also called Webster "hostile and argumentative," and noted that Webster had been treated for depression in 1995. The trial court concluded that the prosecutor's reasons were racially neutral and valid.

Reviewing the trial court's conclusion in light of the evidence in the record, the prosecutor's concerns about Webster's strong opposition to the death penalty are supported by the evidence. Webster stated that he hoped the death penalty would one day be eliminated, that he had a high threshold for imposing it, and he would be unlikely to impose it. The California Court of Appeal did not conduct a comparative juror analysis, so we conduct one here in the first instance. None of the seated jurors expressed as strong opposition to the death penalty as Webster, and none stated they would have voted against retaining the death penalty if it were on the ballot. Therefore, a comparative juror analysis does not raise the inference that the prosecutor's reasons were pretextual.

Sifuentes argues that the prosecutor confused Webster with Massey when he stated that Webster was "hostile and argumentative." The record indicates that any confusion between Webster and Massey was a "mistake in good faith," *Aleman*, 723 F.3d at 982, and does not raise the inference that the prosecutor's reasons were pretextual.

We now turn to the California Court of Appeal's conclusion that the trial court properly accepted the prosecutor's reasons. This determination was not an objectively unreasonable determination of the facts, because the trial court could reasonably determine that the prosecutor's primary motivation in striking Webster was his opposition to the death penalty. *See Cook*, 593 F.3d at 815; *Collins*, 546 U.S. at 340–41.

5. We next turn to juror Massey, and review the relevant portion of the record. In response to the jury questionnaire, Massey stated that his sister was the only family member who had been charged with a crime. The court later learned that Massey's twin brother had a four-page rap sheet listing multiple arrests. In response to questioning, Massey insisted that he did not know of his brother's arrests.

Massey initially gave equivocal responses to the court's question whether he could impose the death penalty, stating, "I've never really thought about that," and that he did "not really" have "any feelings" about the death penalty. When the prosecutor asked whether he could make the "hard call" of imposing the death penalty, Massey responded, "I haven't thought about that, because I've never had to do that." When pressed further, Massey stated that he could see himself choosing to impose the death penalty on non-shooters

because they were eligible for the death penalty under the law.

The prosecutor gave several reasons for striking Massey. First, the prosecutor was concerned that Massey "obviously didn't like [him]." He believed Massey was lying when he claimed he was unaware of his brother's arrests, given that the record showed the twins lived at the same address. The prosecutor also noted that Massey was a postal worker, and "they're lazy." Finally, the prosecutor stated that Massey was "totally nonresponsive" to questions regarding the death penalty, and he "said they're all eligible because the law says they are eligible, not that he'd ever do it." The trial court concluded these were valid, race-neutral reasons. The California Court of Appeal conducted a comparative juror analysis and concluded that, while some of the seated jurors also gave short, "snippy" responses to the prosecutor's questions, their answers did not raise red flags about the jurors' inclination to impose the death penalty. The California Court of Appeal then concluded that the trial court properly accepted the prosecutor's reasons.

In evaluating this ruling, we first conclude that the prosecutor's explanation about Massey's lack of credibility and nonresponsive answers was consistent with the record. Although the prosecutor's stereotype of postal workers is not persuasive, it is race neutral on its face, and the trial court could have reasonably determined that "[t]he prosecutor provided a number of other permissible and plausible race-neutral reasons." *Collins*, 546 U.S. at 340–41. Accordingly, the California Court of Appeal's conclusion that the trial court's credibility finding was supported by substantial evidence is not an objectively unreasonable determination of the facts.

6.   Finally, we turn to juror Skruggs and review the relevant portions of the record.   In response to the juror questionnaire, Skruggs stated that she was a 27-year-old with a seven-year-old son.  She had a prior conviction for forgery for writing a series of fraudulent checks.  During voir dire, Skruggs expressed equivocal views regarding the death penalty.  While she stated that she could vote to execute a non-shooter, if, for example, "someone was egging him on," she also stated that the death penalty was "not necessarily something that I would be able to place on someone that did not actually commit the shooting."

The prosecutor gave three reasons for striking Skruggs: she was a single mother who had a child at age 20, which "shows a lack of responsibility"; she wrote a series of fraudulent checks, which "indicates dishonesty"; and she expressed conflicting views of the death penalty.  The trial court concluded that these reasons were valid and race neutral.  On appeal, the California Court of Appeal conducted a comparative juror analysis.  The court concluded that the one seated juror who expressed similar reservations about imposing the death penalty on a non-shooter was distinguishable from Skruggs, because that juror did not have a prior criminal history.  The California Court of Appeal upheld the trial court's determination that the prosecutor was credible in offering race-neutral reasons.

Based on our review, the prosecutor's explanations that he struck Skruggs because she had a prior conviction and gave conflicting views of the death penalty are supported by evidence in the record.  Sifuentes argues that one of the prosecutor's reasons for striking Skruggs, that she was a single mother who was irresponsible, demonstrates the prosecutor's negative stereotyping of black women.  He also

argues that the prosecutor's statement that he struck Skruggs due to her equivocal views on the death penalty was pretextual, because other jurors had expressed similar views. But Skruggs's prior conviction was a valid and race-neutral reason for striking her, and the California Court of Appeal could reasonably conclude that this conviction made her distinguishable from other seated jurors. Applying our doubly deferential standard, the California Court of Appeal did not make an objectively unreasonable determination of the facts in upholding the trial court's ruling that the prosecutor's reasons were genuine.

## D

Applying the deference to the fact finder's credibility determination required by *Batson*, the California Court of Appeal concluded that the trial court did not err in determining that the prosecutor was credible. Based on our own review of the record, including conducting a comparative juror analysis in the first instance where the state appellate court has not done so, and applying our doubly deferential standard, we conclude that the California Court of Appeal's decision was not based on an unreasonable determination of the facts. Accordingly, we may not grant Sifuentes the writ of habeas corpus. 28 U.S.C. § 2254(d)(2).

## IV

Sifuentes argues that we can uphold the district court's grant of the writ on the alternative ground that the trial court erred in precluding him from rebutting the prosecutor's explanations for four of his strikes of prospective jurors, and this error was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

A

At trial, Sifuentes made three motions under *Batson*. In his first motion, he argued that the prosecutor's strikes of prospective jurors Jackson, Norman, and Jasper were purposely discriminatory on the basis of race. He raised the same claim in his second motion with respect to the prosecutor's strikes of prospective jurors Webster and Massey. The trial court held that Sifuentes had made out a prima facie case of purposeful discrimination, and so the burden shifted to the prosecutor to provide a race-neutral explanation. After the prosecutor provided race-neutral explanations, Sifuentes's counsel asked the court for an opportunity to rebut the proffered reasons. The trial court denied the request, explaining, "This isn't argument. I already made a prima facie finding. You put your statements on the record; now the district attorney has to justify his challenges. That's the way it works."

On appeal, the California Court of Appeal indicated that the trial court had erred in failing to permit the defense counsel to address the prosecutor's reasons. In reaching this conclusion, the court relied on the California Supreme Court's decision in *People v. Ayala*, which held that it was error "as a matter of state law" for a trial court to conduct an ex parte hearing on a *Batson* motion, but that such error "was harmless under state law and that, if federal error occurred, it, too, was harmless beyond a reasonable doubt as a matter of federal law." 24 Cal. 4th 243, 262, 264 (2000) (citing *People v. Watson*, 46 Cal. 2d 818, 836 (1956) and *Chapman v.*

*California*, 386 U.S. 18, 24 (1967), respectively).**⁵** Relying on the reasoning in *People v. Ayala*, the California Court of Appeal concluded that the trial court's error "was also harmless whether we apply *Chapman* or *Watson* standard," because of "the trial court's findings that the prospective African-American jurors were challenged for proper, race-neutral reasons."

## B

Under AEDPA, we must determine whether the California Court of Appeal's rejection of Sifuentes' claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As a threshold matter, the Supreme Court has expressly declined to decide whether a defendant's constitutional rights are violated when the trial court declines to allow the defendant to participate in the trial court's *Batson* colloquy with the prosecutor. *Ayala*, 135 S. Ct. at 2197. Instead, the Supreme Court assumed "for the sake of argument" that the habeas petitioner's "constitutional rights were violated when the trial court heard the prosecution's justifications for its strikes outside the presence of the defense." *Id.* Further, no Supreme Court case requires rebuttal during *Batson* hearings, and *Batson* explicitly declined "to formulate particular procedures to be followed,"

---

**⁵** The subsequent history of *People v. Ayala* is significant here. On habeas review, we held that *People v. Ayala* was wrongly decided because the trial court's error was not harmless, and granted defendant's habeas petition. *See Ayala v. Wong*, 756 F.3d 656, 660 (9th Cir. 2013). Our decision was then reversed by the Supreme Court. *See Davis v. Ayala*, 135 S. Ct. 2187 (2015).

476 U.S. at 99. However, we need not reach the question whether the trial court's decision to preclude Sifuentes from rebutting the prosecutor's explanation was contrary to or an unreasonable application of clearly established Supreme Court precedent. Rather, we follow *Ayala*'s lead and assume for the sake of argument that the trial court's conduct, which the California Court of Appeal identified as an error, was a federal constitutional error. Therefore, again like the Supreme Court in *Ayala*, we turn to the question whether any such error was prejudicial. *See Ayala*, 135 S. Ct. at 2197.

C

In *Ayala v. Davis*, the Supreme Court provided a framework for a federal court to address a habeas petitioner's claim that a state court erred in determining that a constitutional error was harmless.

The Court first noted that on direct appeal, "the harmlessness standard is the one prescribed in *Chapman*," namely that a federal constitutional error is harmless if the court can declare "that it was harmless beyond a reasonable doubt." *Ayala*, 135 S. Ct. at 2197 (quoting *Chapman*, 386 U.S. at 24); *see also Deck v. Jenkins*, No. 13-55130, slip op. at 62 (9th Cir. Feb. 9, 2016) ("even on direct review a constitutional trial error will not warrant reversal if it was harmless beyond a reasonable doubt."). By contrast, in a collateral proceeding, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice'" under *Brecht v. Abrahamson*. *Ayala*, 135 S. Ct. at 2197 (quoting *Brecht*, 507 U.S. at 637); *see also Deck*, No. 13-55130, slip op. at 62 ("In a collateral proceeding, the test is more forgiving to the prosecution."). "The inquiry under *Brecht* is not whether the federal habeas

court could definitively say that there were no winning arguments that the defense could have made," *Ayala*, 135 S. Ct. at 2203, but rather whether the evidence in the record raises "grave doubts about whether the trial judge would have ruled differently." *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)) (internal quotation marks and alteration omitted). A conclusion that such grave doubts exist "requires much more than a 'reasonable possibility' that the result of the hearing would have been different." *Id.* (quoting *Brecht*, 507 U.S. at 637). Rather, "[t]he *Brecht* standard reflects the view that a State is not to be put to the arduous task of retrying a defendant based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." *Id.* (internal quotation marks and alterations omitted) (citing *Calderon v. Coleman*, 525 U.S. 141, 146 (1998)).

While a petitioner seeking federal habeas relief must meet the *Brecht* standard, "that does not mean, as the Ninth Circuit thought, that a state court's harmlessness determination has no significance under *Brecht*." *Id.* at 2198. Although in *Fry v. Pliler*, 551 U.S. 112, 120 (2007), the Supreme Court "held that the *Brecht* standard 'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman* . . . . [t]he *Fry* Court did not hold—and would have had no possible basis for holding—that *Brecht* somehow abrogates the limitation on federal habeas relief that § 2254(d) plainly sets out." *Ayala*, 135 S. Ct. at 2198. Accordingly, "[w]hile a federal habeas court need not formally apply both *Brecht* and AEDPA/*Chapman*," AEDPA nevertheless "sets forth a precondition to the grant of habeas relief." *Id.* (internal quotation marks and alteration omitted).

After explaining the relationship between *Brecht* and AEDPA, *Ayala* then explained how federal courts must apply the AEDPA precondition subsumed in *Brecht*. AEDPA "demands an inquiry into whether a prisoner's 'claim' has been 'adjudicated on the merits' in state court; if it has, AEDPA's highly deferential standards kick in." *Id.* If a state court concludes that "any federal error was harmless beyond a reasonable doubt under *Chapman*," such a decision "undoubtedly constitutes an adjudication of [the prisoner's] constitutional claim 'on the merits'" for purposes of AEDPA. *Id.* Under these circumstances, "a federal habeas court cannot grant [the prisoner] relief unless the state court's rejection of his claim (1) was contrary to or involved an unreasonable application of clearly established federal law, or (2) was based on an unreasonable determination of the facts." *Id.* Under this standard, a court may not overturn the state court's decision "unless that court applied *Chapman* in an objectively unreasonable manner." *Id.* (internal quotation marks omitted); *see also id.* at 2199 ("When a *Chapman* decision is reviewed under AEDPA, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable."). Because "a state-court decision is not unreasonable if fairminded jurists could disagree on its correctness," *id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)) (internal quotation marks and alteration omitted), a habeas petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (quoting *Richter*, 562 U.S. at 103).

In sum, a petitioner "necessarily cannot satisfy" the *Brecht* requirement of showing that he was "actually

prejudiced" by the state court's error in receiving the prosecution's explanation for a challenged strike without the defense present "if a fairminded jurist could agree with the [state appellate court] that this procedure met the *Chapman* standard of harmlessness." *Id.* at 2199. By the same token, if a petitioner does satisfy the *Brecht* requirement of showing that an error resulted in "actual prejudice," then the petitioner necessarily must have shown that the state court's determination that the error was harmless was objectively unreasonable. *See Deck*, No. 13-55130, slip op. at 63 ("A determination that the error resulted in actual prejudice necessarily means that the state court's harmlessness determination was not merely incorrect, but objectively unreasonable." (internal quotation marks omitted)).**[6]**

## D

With this framework in mind, we now consider whether, assuming that the trial court's denial of Sifuentes's request to rebut the prosecutor's proffered reasons was a federal constitutional error, any such error was prejudicial. *See Ayala*, 135 S. Ct. at 2197. Because AEDPA "sets forth a precondition to the grant of habeas relief," *id.* at 2198, we begin by considering whether Sifuentes's claim has been adjudicated on the merits. Here, the California Court of Appeal determined that the trial court's error was harmless under *Chapman*. Because this constitutes an adjudication of the claim on the merits, "the highly deferential AEDPA standard applies, [and] we may not overturn the [state court's]

---

**[6]** Of course, because the *Brecht* standard subsumes the AEDPA analysis, an error could be objectively unreasonable under AEDPA and still not be actually prejudicial.

decision unless that court applied *Chapman* in an objectively unreasonable manner." *Id.*

Here a reasonable jurist could conclude that the California Court of Appeal's application of *Chapman* was not objectively unreasonable. The prosecutor challenged each of the jurors for race-neutral reasons, and the trial court listened to and evaluated each of those reasons and determined that they were genuine. Sifuentes has not identified how an opportunity to respond to the prosecutor's explanations for striking any of the potential jurors could have made any difference to the trial court and state appellate court's acceptance of the prosecutor's credibility. As in *Ayala*, there is "no support for the suggestion" that Sifuentes's attorney, if allowed to participate, would have been able to convince the trial court that the prosecutor's reasons were pretextual. *Id.* at 2205. We therefore conclude that the California Court of Appeal's determination that any error was harmless beyond a reasonable doubt was not an unreasonable application of *Chapman*. *See* 28 U.S.C. § 2254(d)(1). Because "a fairminded jurist could agree" with the state court's *Chapman* determination, Sifuentes "necessarily cannot satisfy" the *Brecht* requirement of showing that he was "actually prejudiced" by the state court's error. *Id.* at 2199. Moreover, there is no reasonable possibility the trial judge would have ruled differently had he allowed rebuttal, and therefore we do not have a "grave doubt" that Sifuentes was actually prejudiced. *See Ayala*, 135 S. Ct. at 2197–98.

**REVERSED and REMANDED with instructions to DISMISS the petition.**