**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARVIN PETE WALKER, | No.   19-15087 |
| Petitioner-Appellant, | D.C. No. 4:94-cv-01997-PJH |
| v. | |
| RONALD DAVIS, Warden of San Quentin State Prison, | MEMORANDUM* |
| Respondent-Appellee. | |

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, Chief District Judge, Presiding

Argued and Submitted June 19, 2020
San Francisco, California

Before:  WALLACE, GILMAN,** and GRABER, Circuit Judges.
Dissent by Judge WALLACE

Marvin Pete Walker was convicted and sentenced to death in a California

state court for murder, assault, robbery, and other charges in 1980.  He now

appeals the district court's dismissal of his petition for habeas corpus with regard

---

\*      This disposition is not appropriate for publication and is not precedent except as
provided by Ninth Circuit Rule 36-3.

\*\*      The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S.
Court of Appeals for the Sixth Circuit, sitting by designation.

to the following claims:  (1) that the prosecutor impermissibly struck all three black potential jurors from the venire using peremptory challenges, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986); and (2) that Walker was convicted of special-circumstance murder based on a deficient jury instruction that denied him due process.  The district court granted a certificate of appealability only as to the *Batson* claim.  For the reasons set forth below, we reverse the district court on the *Batson* claim.  We remand the case to the district court with instructions to grant the writ of habeas corpus unless the State, within a reasonable amount of time, has instituted a retrial of Walker.  Because we grant habeas relief on the *Batson* claim, we need not decide whether to grant a certificate of appealability regarding the other claim.

We review de novo a district court's denial of a petition for a writ of habeas corpus.  *Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc).  But under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant a writ of habeas corpus to a state prisoner only if the state-court rulings on the prisoner's federal constitutional claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)–(2).

The Supreme Court has provided the following interpretation of the term "unreasonable":

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 103 (2011). And "[f]or habeas petitions alleging a *Batson* violation, 'our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it.'" *Currie v. McDowell*, 825 F.3d 603, 609 (9th Cir. 2016) (quoting *Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013)).

Despite this high bar to relief, Walker has made such a showing in the present case. The prosecutor struck all 3 black potential jurors from a venire of approximately 155 individuals by using peremptory challenges, and the stated reasons for doing so do not hold up under scrutiny. Some of those reasons were unreasonable or irrelevant, others were demonstrably false, and still others applied equally to nonblack jurors who were nonetheless permitted to serve on the jury. *Cf. id.* at 605 (granting habeas relief based on these same deficiencies). Although the trial court rejected some of the irrelevant reasons that the prosecutor offered, it nonetheless credited other reasons that were clearly pretextual. And the California

Supreme Court, in turn, simply restated, without any analysis, the prosecutor's proffered reasons for striking all of the black potential jurors, *People v. Walker*, 765 P. 2d 70, 80–81 (Cal. 1988), including reasons that even the trial court had rejected.  Both decisions by the California courts were therefore so "lacking in justification" as to constitute "an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d)(2); *Harrington*, 562 U.S. at 103.

The Supreme Court in *Batson* established a three-part test for determining whether a prosecutor's use of peremptory challenges to exclude prospective jurors violates the Fourteenth Amendment's Equal Protection Clause.  This test was restated in *Ali v. Hickman*, 584 F.3d 1174 (9th Cir. 2009), as follows:

> First, the defendant must make a prima facie showing that a challenge was based on race.  If such a showing is made, the burden then shifts to the prosecutor to produce a "clear and reasonably specific" race-neutral explanation for challenging the potential juror.  Third and finally, the court must determine whether, despite the prosecutor's proffered justification, the defendant has nonetheless met his burden of showing "purposeful discrimination."  To make this last determination, the court evaluates the "totality of the relevant facts" to decide "whether counsel's race-neutral explanation for a peremptory challenge should be believed."

*Id.* at 1180 (quoting *Kesser v. Cambra*, 465 F. 3d 351, 359 (9th Cir. 2006) (en banc)).

Neither party challenges the trial court's conclusion that Walker established a prima facie case and that the prosecutor satisfied his step-two burden.  The sole remaining issue is whether the California courts erred in concluding that Walker

4                                                                    19-15087

"failed to meet his ultimate burden of establishing that the prosecutor's challenges were motivated by purposeful racial discrimination." *See id.*

To meet that burden, Walker "need not prove that all of the prosecutor's race-neutral reasons were pretextual, or even that the racial motivation was 'determinative.'" *Currie*, 825 F.3d at 605 (citations omitted). Walker must instead "demonstrate that 'race was a substantial motivating factor' in the prosecutor's use of the peremptory strike." *Id.* at 606 (quoting *Cook v. LaMarque*, 593 F.3d 810, 815 (9th Cir. 2010)). If even "a single prospective juror [was struck] for a discriminatory purpose," that suffices to make out a *Batson* violation. *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019).

We "must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" in order to determine whether Walker has carried his burden of persuasion. *Batson*, 476 U.S. at 93 (citation and internal quotation marks omitted). "The 'circumstantial and direct evidence' needed for this inquiry may include a comparative analysis of the jury voir dire and the jury questionnaires of all venire members, not just those venire members stricken." *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

19-15087

Moreover, "where we are separated by time and distance from the proceedings [as in the present case], we must conduct a more formal comparative juror analysis because it is the only means we will have for assessing the state court's factfinding." *Murray v. Schriro*, 745 F.3d 984, 1005 (9th Cir. 2014). This is true despite the fact that the state courts were not required to conduct a comparative juror analysis prior to *Miller-El*. *See McDaniels v. Kirkland*, 813 F.3d 770, 778–79 (9th Cir. 2015) ("A comparative analysis of the treatment of jurors may therefore be central to a federal court's review of whether a state court's findings as to purposeful discrimination were reasonable, regardless of the fact that the state court was not required by clearly established law to perform such comparisons."). Contrary to the dissent's contention, we are not requiring the prosecutor to "justify" each strike; we are simply undertaking a comparative juror analysis.

Such a comparative juror analysis lays bare the purposeful discrimination in the case before us. The most glaring evidence of unequal treatment relates to the prospective jurors' views on the death penalty. Black potential jurors D.K. and M.G. were struck because of their purported anti-death-penalty views. But a review of the record demonstrates not only that the prosecutor mischaracterized their views, but also that nonblack jurors with similar or even stronger views against the death penalty were nonetheless permitted to serve.

6                                                                      19-15087

D.K., for example, stated that she felt "very strongly about a person taking another person's life, whatever the case, whatever the situation," and that she took seriously the biblical Commandment "thou shalt not kill." But she also stated that she "believe[d] in the laws of society" and that the death penalty "has to be carried out in some cases." She further stated that she "probably could" consider the death penalty and that she did not feel that her death-penalty views would influence her in deciding the *guilt* portion of the case. But the prosecutor justified eliminating D.K. because, according to him, she had "very strong feelings about the death penalty that were not favorable . . . . I believe she said it might have some influence on her in the guilt phase. I'm not very clear about that."

As for M.G., the prosecutor claimed that M.G. "volunteered that he was not comfortable at all with the fact that it was a death penalty situation." M.G. had said that, like for "everyone else," imposing the death penalty would be an emotional decision. But he also expressed the thought that "they don't use it [the death penalty] enough." And when the prosecutor asked if he would be less prone to use the death penalty, M.G. answered, "No."

Compare the above voir dire of D.K. and M.G. to the prosecutor's treatment of white juror A.K., who was left on the jury despite stating that he had "severe doubts" about the death penalty, that he held a "partial preconceived notion" against it, and that it would be "very difficult" for him to consider the death

7                                                                    19-15087

penalty as an option. Or consider that G.A., another nonblack juror, was left on the jury despite having expressed similar reservations about the death penalty. G.A. stated that, although she "believe[d] in some cases it's [the death penalty] justified," she "would hate to be on a jury that would have to make that decision." And the prosecutor allowed A.A., still another nonblack potential juror—who said that she could not consider the death penalty at all, but that her views on the death penalty would not affect her decision in the guilt phase of the case—to be impaneled as an alternate with the understanding that, if she ended up serving, she would simply be excused from the penalty phase. With all due respect, we therefore believe that the dissent's assertion "that D.K.'s views were stronger than those of the two non-black panelists who [were] permitted to serve (G.A. and A.K.)" is simply not borne out by the record.

We also disagree with the dissent's characterization that D.K.'s views "were rooted in a firmly held religious belief that . . . would be applicable to her duties as a juror." D.K.'s overall response, as evidenced in her statements above, shows that any religious beliefs that D.K. held would not have interfered with her ability to apply the laws of society, including the death penalty.

Finally, the dissent's contention that C.L.'s "anti-death penalty views could be considered stronger than D.K.'s" is a considerable understatement. The record reveals the following exchange with the prosecutor:

Q. If we ever get to that second stage, that you were to consider both alternatives, could you do that?

A. I could consider them, but I know I would reject the death penalty.

Q. Even without regard to any of the facts of the case? Without having heard anything?

A. That's true.

Q. Do you think that there's a chance that if we ever get to that stage that you might seriously consider capital punishment or the death penalty?

A. No.

Q. Even if the court were to instruct you that that was the law and you took an oath to obey the law?

A. I just couldn't.

C.L.'s anti-death-penalty views were clearly far stronger than those of D.K. So the prosecutor's peremptory challenge of C.L., a nonblack juror, on the basis of C.L.'s views provides no basis to justify his strike of D.K. as race neutral.

The prosecutor also asked leading questions obviously designed to create a record on which to base his strike of D.K. His questions of juror A.K., on the other hand, were clearly designed to allow A.K. to serve on the jury. When questioning D.K., for example, the prosecutor remarked: "That would seem to make it impossible for you, to me, if I understand you right, . . . it would seem to make it almost impossible for you to ever vote guilty and then apply the death penalty in a case where the law calls for it?" But when questioning A.K., the prosecutor commented: "You're willing to keep your mind open, and although you cringe at the thought of voting that, in that manner, that you would be able to look at that as a real alternative for you to, depending on what has been proven?" The Supreme

19-15087

Court in *Miller-El* concluded that similar disparate questioning of white and nonwhite potential jurors on their death-penalty views was evidence of pretext. 545 U.S. at 249.

Such disparate questioning was also manifest when the prosecutor questioned D.K., M.G., and the third black potential juror—D.B.—about their previous interactions with the police. The prosecutor later cited these interactions as evidence that the three black potential jurors harbored antipolice bias. For example, the prosecutor asked D.K. if she had ever had "bad experiences with police." She answered: "no," but nevertheless related two incidents that she referred to as "a couple [of] little harassments" related to unwarranted suspicion and surveillance. The only follow-up questions that the prosecutor asked were when the incidents had occurred (both several years before) and whether they involved the San Jose Police Department (they had). He never asked whether those incidents would influence D.K.'s ability to fairly evaluate the evidence.

By contrast, the prosecutor asked the following leading question of A.K., who had previously been arrested for a DUI: "There's nothing about that [your DUI case], and frankly, it's awfully remote from a case like this, but there's nothing about that case that would influence you here?" The prosecutor's reliance on one of the minor incidents that D.K. recalled is all the more suspect because, when the prosecutor responded to Walker's *Batson* motion, he could not recall if

that incident had happened to D.K. or to D.B., the other black female panelist.

The prosecutor also cited antipolice bias to strike D.B. He asserted that he saw D.B. suppress a smile when defense counsel asked her if she would give a testifying police officer "more credibility simply because he's a police officer." In response, D.B. apologized for her tendency to smile. D.B. did explain that she "wonder[ed]" about San Jose police "dealings with minorities," and that she "question[ed]" whether the police were biased against minorities, but she also testified that she had never personally witnessed any police harassment. When the prosecutor explained his justification for the strike, he told the court that D.B. had previously made a complaint to law enforcement, based on her husband being followed home by the police, but in fact D.B.'s husband had been the one to complain.

In addition, the prosecutor asked questions designed to paint D.B. in a biased light. He stated, for example: "You mentioned when counsel asked you about the trial here and the defendant, the racial question . . . you kind of started breathing real fast . . . . And I take it there was something else you wanted to say that you didn't . . . ." D.B.'s response to this was simple: "There was nothing else that I desired to say about that." But the prosecutor continued: "You did say that you are a strong advocate of black people's rights and of—why don't you say it again for me." D.B. replied: "I don't understand. I don't think I can recall exactly what

I said at the moment." In response to repeated questioning by the prosecutor on this topic, D.B. made clear that she "felt human rights [came] before minority and any particular ethnic group's rights." She also stated, in response to a question about her ability to be impartial, "I feel that I would be as fair and honest as I possibly could with the evidence placed before me."

Finally, disparate questioning was again evident when the prosecutor questioned M.G. about his previous interactions with the police. The prosecutor asked M.G. numerous questions about these interactions that appear designed to paint M.G. in a bad light. He asked, for example, "[w]as it [being pulled over] predominantly when you were wearing things like the leather jacket you mentioned?" and "[h]ave all of them been like at eleven o'clock until three o'clock in the morning, that kind of time?" But when questioning A.K. about his DUI, the prosecutor asked only if A.K. thought that he had been treated unfairly, which agency arrested him, and a leading question regarding whether the DUI case would influence A.K. in Walker's case. He did not ask, for example, what A.K. was wearing at the time of his arrest or at what time of day he had been driving. And the prosecutor did not ask M.G. a comparable question about whether these interactions with the police would influence him in Walker's case.

Strikingly, M.G. actually expressed sympathy for the police, stating: "I mean, some of them are overworked. Some of them are a little upset. Some can't

19-15087

deal with the public because they are used to dealing with criminals all the time." In explaining how he had been mistaken on several occasions by police pursuing another black man, M.G. stated that "[s]ometimes I can understand officers being cautious because he doesn't know what's happening. He just has a description come over." M.G. further testified that he had friends and relatives associated with law enforcement, including an uncle who had been killed in the line of duty, a cousin with the Oakland Police, and a friend on the police department in Palo Alto. If anything, these connections to law enforcement should have made M.G. an attractive juror for the prosecution. *See Kesser v. Cambra*, 465 F.3d 351, 371 (9th Cir. 2006) (en banc) (finding pretext where the prosecutor struck a black potential juror who had "connections to law enforcement" where "it seems likely she would be a strong prosecution juror"). Yet the prosecutor cited antipolice bias as a reason for striking M.G.

The prosecutor also offered a myriad of other flawed reasons. He claimed, for example, that he struck D.B. because of her eagerness to serve on the jury. As the prosecutor put it, he was "always suspicious when someone is that anxious to sit on a jury. . . . The only thing I think of would be that someone that anxious to serve is someone who would not be thinking of reaching any penalty." But the record shows just the opposite: D.B. raised her recent jury service and mother's visit as reasons that she should *not* have to serve again. But when asked if jury

service would create a hardship, she simply replied: "No, it wouldn't be a hardship. I just wouldn't do these things that we planned to do, and it's nothing that special that it can't be cancelled, I suppose, to another year." And she confirmed that serving on the jury "wouldn't be upsetting." These responses are totally inconsistent with the prosecutor's characterization that D.B. was "anxious to serve." And comparative juror analysis shows that a white juror, J.A., affirmatively stated that he wanted to be a juror. Yet the prosecutor did not object to J.A. being impaneled.

As a further point regarding comparative juror analysis, we note that the dissent cites *Rice v. Collins*, 546 U.S. 333 (2006), no fewer than a dozen times for various propositions related to our general standard of review under AEDPA. But it fails to point out that the comparative juror analysis in *Rice* revealed strikingly different facts. The prosecutor in *Rice* used a peremptory strike on a black female juror, but the prosecutor's stated reasons for doing so—the prosecutor's "wariness of the young and the rootless"—"could be seen as race neutral, for she used a peremptory strike on a white male juror, Juror 6, with the same characteristics." *Id.* at 341. In other words, the comparative juror analysis in *Rice* evidenced that the prosecutor struck both black and white jurors for exactly the same reasons. Comparative juror analysis in this case, by contrast, reveals just the opposite.

Still other reasons given by the prosecutor in the present case are highly

questionable. The prosecutor, for example, used the personal appearance and dress of M.G. and D.B. to justify, in part, those strikes. Despite the trial court explicitly rejecting these reasons, the California Supreme Court simply repeated the prosecutor's reasoning regarding M.G.'s clothing and failed to comment on D.B.'s attire at all. *See Walker*, 765 P. 2d at 80–81.

The California courts' treatment of the prosecutor's stated reasons failed to satisfy *Batson*. As we expressed in *Currie*, 825 F.3d 603:

> If a prosecutor supplies enough reasons for a strike, it may well be likely that one of those reasons is plausible. But it remains the case that implausible justifications "may (and probably will) be found to be pretexts for purposeful discrimination." Courts applying the *Batson* procedure therefore cannot stop investigating after finding one of a prosecutor's multiple proffered reasons plausible. As is evident here, finding multiple other reasons to be pretextual may well lead to the conclusion that the prosecutor's strike was discriminatory.

*Id.* at 613–14 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)). The above-quoted reasoning is particularly applicable here because, where a "prosecutor offer[s] several pretextual explanations for these strikes, . . . this undercuts his credibility." *Kesser*, 465 F.3d at 369.

In sum, the record reveals that the prosecutor mischaracterized the views of all three black potential jurors, adopted disparate lines of questioning for black and nonblack jurors, and cited reasons for striking the black jurors that applied equally to nonblack jurors who were left on the jury. These errors by the California courts are "beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at

103, and obviate the deference that we would otherwise accord to the state trial court's evaluation of the prosecutor's credibility, *Currie*, 825 F.3d at 609.

Walker has therefore carried his burden to demonstrate that a *Batson* violation took place and that he is entitled to habeas relief on this basis. *Id.* at 605 (granting habeas relief based on a *Batson* violation where the prosecutor had "removed one African American juror via peremptory strike," and "[h]is stated reasons for striking this juror were all flawed—each reason was either unreasonable, demonstrably false, or applied just as well to the non-black jurors . . . allowed to remain on the jury"). Because Walker is entitled to a new trial, *see Crittenden v. Chappell*, 804 F.3d 998, 1003 (9th Cir. 2015), we need not consider whether to grant a certificate of appealability on his claim regarding the deficient jury instruction. We presume that, if the State retries Walker, the trial court will remedy the jury instruction.

For all of the above reasons, we REVERSE the district court on the *Batson* claim. We REMAND the case to the district court with instructions to grant the writ of habeas corpus unless the State, within a reasonable amount of time, has instituted a retrial of Walker.

**REVERSED AND REMANDED.**

*Marvin Walker v. Ron Davis*, No. 19-15087

WALLACE, Senior Circuit Judge, dissenting:

The Supreme Court has repeatedly admonished us to adhere to the highly deferential standard of review of state court judgments that the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), requires in federal habeas cases. *See, e.g.*, *Rice v. Collins*, 546 U.S. 333, 335 (2006) ("the Court of Appeals for the Ninth Circuit erred, misapplying settled rules that limit its role and authority" by "sett[ing] aside reasonable state-court determinations of fact in favor of its own debatable interpretation of the record"). I recognize that the majority would have decided this case differently than the California courts did, but "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "Though it recited the proper standard of review, the panel majority improperly substituted its evaluation of the record for that of the state trial court." *Rice*, 546 U.S. at 337–38. Accordingly, I must dissent.

"Under AEDPA, we may only disturb a state court's determinations of law if they were 'contrary to' or 'involved an unreasonable application of' clearly established federal law as determined by the United States Supreme Court." *Wade v. Terhune*, 202 F.3d 1190, 1194–95 (9th Cir. 2000), *quoting* 28 U.S.C. § 2254(d)(1). Similarly, this court must accept a state court's factual determinations—including

"whether the prosecutor's strikes were purposefully discriminatory"—unless such determinations were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Sifuentes v. Brazelton*, 825 F.3d 506, 517 (9th Cir. 2016), *quoting* 28 U.S.C. § 2254(d)(2). As a result, AEDPA's standard for evaluating state-court rulings is not only "difficult to meet and highly deferential," but it "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations and internal quotation marks omitted).

In evaluating habeas petitions premised on *Batson* violations, the standard of review is "doubly deferential" such that "unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it." *Sifuentes*, 825 F.3d at 518, *quoting Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012). The "pertinent question is not whether the prosecutor was credible, or even whether the trial court's conclusion to that effect was clearly erroneous," but "whether the state appellate court was objectively unreasonable in upholding the trial court's determination." *Id.* Thus, "[e]ven if we would have reached a different conclusion regarding the prosecutor's credibility, we must give the state appellate court the benefit of the doubt, and may not grant the habeas petition unless the state court's decision was

not merely wrong, but actually unreasonable." *Id.* (citation and internal quotation marks omitted).

In applying these standards, we examine the "last reasoned decision" in the state court system, here, the California Supreme Court's December 1988 opinion, *People v. Walker*, 47 Cal. 3d 605 (1988). *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). In that opinion, the California Supreme Court affirmed Walker's convictions after examining the trial court's denial of Walker's motion for a mistrial under California's equivalent of *Batson*.[1] *Walker*, 47 Cal. 3d at 625–26 & n. 5. Thus, to secure relief, Walker must demonstrate that the California Supreme Court was not merely wrong, but was "objectively unreasonable" in affirming the trial court. *Sifuentes*, 825 F.3d at 518.

Walker argues that California Supreme Court's decision not to vacate his convictions was unreasonable because neither that court nor the trial court adequately performed the third step of the *Batson* test.[2] The decisive question at the third *Batson* step is "whether counsel's race-neutral explanation for a peremptory

---

[1] Walker moved for a mistrial under *People v. Wheeler*, 22 Cal. 3d 258 (1978), which is considered California's "procedural equivalent to a challenge made under *Batson*." *Williams v. Runnels*, 432 F.3d 1102, 1103 n.1 (9th Cir. 2006).

[2] A *Batson* challenge has three steps: first, "the defendant must make a prima facie showing that a challenge was based on race;" second, the prosecution must offer a race-neutral basis for the challenge; and third, the court must determine whether the defendant has shown "purposeful discrimination." *Ali v. Hickman*, 584 F.3d 1174, 1180 (9th Cir. 2009); *see Batson*, 476 U.S. at 96–98.

challenge should be believed" or whether it was pretextual to hide a racial motivation. *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004) (citation omitted).

Although this final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice*, 546 U.S. at 338 (internal quotation marks and citation omitted). Importantly, even if our court agrees that the "the trial court had reason to question the prosecutor's credibility" regarding certain reasons proffered, the California Supreme Court's decision should not be disturbed unless the record would "compel the conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications." *Id.* at 341–42. That is, our court would need to hold that the California Supreme Court was not only erroneous but was "objectively unreasonable" in its decision to affirm the trial court. While "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility," that "does not suffice to supersede the trial court's credibility determination." *Id.*

The majority concludes that a *Batson* violation occurred because the "prosecutor mischaracterized the views of all three black potential jurors, adopted disparate lines of questioning for black and nonblack jurors, and cited reasons for

striking the black jurors that applied equally to nonblack jurors who were left on the jury." "Viewing the panel majority's concerns together," however, "the most generous reading would suggest only that the trial court had reason to question the prosecutor's credibility." *Rice*, 546 U.S. at 341. "That does not, however, compel the conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications and conclude [that Walker] had shown a *Batson* violation." *Id.*

According to Walker, if the state courts had properly conducted the third *Batson* step, their analysis would have revealed that the prosecutor's peremptory strikes were racially motivated. Walker lodges two central arguments regarding the California Supreme Court's decision.

First, Walker argues that the California Supreme Court analysis was too "cursory" and faults that court for echoing the prosecutor's proffered reasons without expressly evaluating them. We previously rejected this argument and affirmed the denial of a habeas *Batson* challenge in *Cook v. LaMarque*, 593 F.3d 810, 815–16 (9th Cir. 2010). In that case, we acknowledged that the state appellate court "failed to undertake any meaningful inquiry into direct or circumstantial evidence of the prosecutor's intent in striking the jurors" and instead "merely reiterate[d] the prosecutors stated reasons." *Cook*, 593 F.3d at 815–16 (citation and internal quotation marks omitted). However, we held that it was sufficient that the

*trial court* had considered "the prosecutor's proffered justifications and the relevant facts" and had determined that the justifications were not pretextual. *Id.* We explained that the trial court's factual finding satisfied *Batson*'s third step and was entitled to deference. *Id.*

Like in *Cook*, the trial court here "consider[ed] the prosecutor's proffered justifications and the relevant facts." *Id.* For example, after observing D.K.'s testimony, the trial court agreed with the prosecutor about D.K.'s view of the San Jose Police Department: "although I felt [D.K] was a very bright and very honest prospective juror, I did detect a sense that she felt some harassment of minorities by the San Jose Police Department." Because peremptory challenges are "often based on subtle impressions and intangible factors," *Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015), and because "intangibles as voice inflection and body language are impossible to judge from a cold transcript," *Kesser v. Cambra*, 465 F.3d 351, 363 (9th Cir. 2006), the evaluation of "the state of mind of a juror" falls "peculiarly within a trial judge's province," *Hernandez v. New York*, 500 U.S. 352, 365 (1991). We have previously characterized the trial judge as the "primary arbiter of credibility" because only the trial judge has "the unique opportunity to observe the demeanor of the prosecutor as he justified the peremptory strike, as well as [the juror] as she interacted with counsel during voir dire." *Rhoades*, 354 F.3d at 1109. In other words, "[a]ppellate judges cannot on the basis of a cold record easily second-guess

a trial judge's decision about likely motivation" because the "trial judge is best placed to consider the factors that underlie credibility: demeanor, context, and atmosphere." *Rice*, 546 U.S. at 343 (Breyer, J., concurring).

Because we "analyze[] only the transcripts from voir dire," we are "not as well positioned as the trial court is to make credibility determinations." *Sifuentes*, 825 F.3d at 515. Even so, we can discern that the record supports the trial court's determination. For example, D.K. testified that the San Jose Police Department had subjected her and her husband to a "couple little harassments" in the form of unwarranted suspicion and surveillance. Particularly in light of the fact that the San Jose Police Department's officers were involved in Walker's case, this reason does not seem pretextual. *Cf. Felkner v. Jackson*, 562 U.S. 594, 596 (2011) (addressing the striking of a juror who had "perceived harassment by law enforcement based in part on race"). The majority is also suspicious of the prosecutor's motives because, when the prosecutor responded to Walker's *Batson* motion, he could not recall if D.K.'s statements were correctly attributed to D.K. or to D.B., the other black female panelist. However, "a prosecutor's mistake in good faith, such as an innocent transposition of juror information, does not support a finding that the prosecutor is not credible." *Sifuentes*, 825 F.3d at 528 (internal quotation marks omitted). Accordingly, Walker fails to establish that the trial court's determination was "objectively unreasonable."

The trial court also rejected several reasons proffered by the prosecutor. For example, one of the three reasons the prosecutor proffered for striking M.G. was his appearance: M.G. was wearing "the kind of leather jacket worn by motorcycle gang members back in the 50's" and he "had an extremely unkempt beard." The court rejected this reason on the grounds that wearing a leather jacket is "only good judgment when you're riding a bike" and the prosecutor's concerns were not "borne out by any of the testimony of the juror." The court's rejection of a number of the prosecutor's reasons demonstrates that the trial court was properly performing *Batson*'s third step in "evaluating the persuasiveness of the justification proffered by the prosecutor." *Rice*, 546 U.S. at 338 (internal quotation marks omitted).

Walker argues that the California courts failed to examine how the prosecutor's "plainly pretextual" justifications, such the one above concerning M.G.'s appearance, affected the credibility of the prosecutor's remaining justifications. Although it is true that a prosecutor's credibility is undercut when he or she "offer[s] several pretextual explanations for these strikes," *Kesser v. Cambra*, 465 F.3d 351, 369 (9th Cir. 2006), I disagree that this principle applies here. The conclusion in *Kessler* relied on the fact that comparative juror analysis revealed that the reasons given for striking a minority juror applied "just as well to an otherwise-similar" non-minority who was permitted to serve. *Id.* at 360. Here, Walker has not carried his burden of persuasion by demonstrating that a non-minority juror was

permitted to serve despite similar clothing and facial hair. Moreover, the fact that the prosecutor offered a reason pertaining to M.G.'s appearance does not necessarily indicate that the reason was pretextual. *See Purkett v. Elem*, 514 U.S. 765 (1995) ("The prosecutor's proffered explanation in this case—that he struck juror number because he had long, unkempt hair, a mustache, and a beard—is race neutral and . . . a nondiscriminatory reason for the strike"); s*ee also Rice*, 546 U.S. at 343 (Breyer, J., concurring) ("the exercise of a peremptory challenge can rest upon instinct not reason").

In affirming the trial court's analysis, the California Supreme Court's decision correctly articulated the essence of *Batson*'s third step: courts must examine the "circumstances of the case" to "distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." The California Supreme Court then examined the reasons the prosecutor provided, as well as the trial court's efforts to "critically evaluate the prosecutor's explanations," and concluded that the "record supports the [trial] court's conclusion that the prosecutor properly exercised his peremptory challenges on grounds of individual bias." We must provide the "benefit of the doubt" that the California Supreme Court did as it says it did, *Sifuentes*, 825 F.3d at 518— particularly here, when the trial court critically assessed the legitimacy of the reasons proffered by the prosecutor. *See Cook*, 593 F.3d at 815.

Second, Walker faults the California courts for failing to conduct comparative juror analyses. However, we have previously rejected the argument that a state court's "failure to conduct a comprehensive comparative juror analysis" sua sponte rendered the decision unreasonable "because no clearly established Supreme Court precedent at the time" of the state court's decision "required state courts to conduct" such analysis. *McDaniels v. Kirkland*, 813 F.3d 770, 775–76 (9th Cir. 2015). In *McDaniels*, we explained that a state court's failure to conduct comparative juror analysis in a 2003 decision did not render that decision "contrary to or an unreasonable application" of law because the Supreme Court itself did even not begin to conduct comparative juror analyses until 2005. *Id.* Because the relevant state proceedings in this case (taking place on or before 1988) predate even the 2003 decision under review in *McDaniels*, that holding applies *a fortiori* here.

In any case, Walker's own juror comparisons do not show that the California Supreme Court "was objectively unreasonable in upholding the trial court's determination." *Sifuentes*, 825 F.3d at 518. For example, Walker complains that, in exploring anti-police bias, the prosecutor asked more probing questions of M.G. than of A.K. (one of the white panelists permitted to serve) despite M.G. and A.K.'s purportedly similar negative experiences with the police. However, a review of the record reveals that M.G.'s interactions with the police were very different from A.K.'s interactions. A.K. was arrested for driving while intoxicated by the "Sheriff's

Department," who, in A.K.'s opinion, did not treat him unfairly or unprofessionally. By contrast, M.G. was pulled over by an officer from San Jose Police Department, which is the same department employing the officers who would likely be witnesses at Walker's trial. In M.G.'s words, one of those officers "put a gun to [M.G.'s] head" "just for a traffic ticket." M.G. subsequently filed an "excessive force" complaint with internal affairs because he felt that he "wasn't being treated as a citizen." M.G. also said he suffered from "average black man syndrome," in which San Jose police had repeatedly pulled him over because they mistook him for a criminal suspect. It is unsurprising that such different interactions would yield different questions during voir dire. In light of these facts, I will not join the majority to determine that the California Supreme Court was objectively unreasonable to conclude that M.G.'s experiences with the San Jose police provided a non-pretextual basis to exercise a peremptory challenge.

In conducting its own comparative juror analysis, the majority attempts to distinguish *Rice* on the grounds that the prosecutor in that case struck a white male juror for the same reason that she struck a black female juror, which suggested, in the Court's opinion, that the striking of the black female juror was "race neutral." *See Rice*, 546 U.S. at 341. The majority is incorrect, however, to conclude that the record reveals the "opposite" here.

For example, the prosecutor struck D.K. in large part due to her views regarding the death penalty, but the prosecutor also struck at least one non-black potential juror (C.L.) who also harbored anti-death penalty views. Although C.L.'s articulation of her anti-death penalty views could be considered stronger than D.K's, the same level of scrutiny also reveals that D.K's views were stronger than those of the two non-black panelists who were permitted to serve (G.A. and A.K). D.K.'s views, unlike G.A. or A.K.'s views, were rooted in a firmly held religious belief that "one of the Commandments," which prohibits killing, would be applicable to her duties as a juror. Neither G.A. nor A.K. invoked their religious faiths in discussions regarding the death penalty, nor did they make anti-death penalty comments as strong as the ones by D.K. As a result, it would not be "unreasonable" to conclude that the prosecutor here struck D.K. (a black potential juror) and C.L. (a non-black potential juror), while leaving G.A. and A.K. on the jury, simply because D.K.'s and C.L's views regarding the death penalty were perceived as more of an impediment to the function of a jury in a capital case than G.A's or A.K.'s views. In other words, the evidence in the record does not "compel the conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications." *Rice*, 546 U.S. at 341–42.

The majority's interpretation of the record leads them to conclude that "the prosecutor's peremptory challenge of C.L., a nonblack juror, on the basis of C.L.'s

views provides no basis to justify his strike of D.K. as race neutral." This statement makes explicit the error infecting the majority's analysis as a whole. The majority's reasoning imposes a burden on the prosecutor to "justify" each strike by pointing to instances in which that prosecutor also struck potential jurors of a different race who bore an unspecified degree of similarity with each stricken potential juror. However, this standard reverses "the ultimate burden of persuasion regarding racial motivation," which "rests with, and never shifts from, the opponent of the strike." *Id.* at 338 (internal quotation marks and citation omitted). In addition, this standard would be unworkable. Even in the cases where the prosecutor also had occasion to strike another juror of a different race for the same reason, this standard would result in endless disagreements regarding the similarity of the potential jurors, as demonstrated by the disagreement between myself and the majority regarding the similarity of C.L.'s and D.K.'s anti-death penalty views.

While a comparative juror analysis can serve as a tool to examine bias, AEDPA does not require us to wade into the morass created by majority's standard. Indeed, as stated above, the "pertinent question is not whether the prosecutor was credible, or even whether the trial court's conclusion to that effect was clearly erroneous," but "whether the state appellate court was objectively unreasonable in upholding the trial court's determination." *Sifuentes*, 825 F.3d at 518. This focus is crucial because "[a]ppellate judges cannot on the basis of a cold record easily

second-guess a trial judge's decision about likely motivation" since the "trial judge is best placed to consider the factors that underlie credibility: demeanor, context, and atmosphere." *Rice*, 546 U.S. at 343 (Breyer, J., concurring).

Although "the trial court had reason to question the prosecutor's credibility" and "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility," Walker has not shown that it was "unreasonable to credit the prosecutor's race-neutral explanations." *Id.* at 338–42. Thus, AEDPA does not permit us "to supersede the trial court's credibility determination" in this case. *Id.* at 342. Under the "doubly deferential" standards applicable here, I would hold that the California Supreme Court was not "objectively unreasonable" in concluding that substantial evidence supported the trial court's determination that the prosecutor exercised his peremptory challenges for race-neutral reasons. *Sifuentes*, 825 F.3d at 518. Accordingly, I would affirm the district court.[3]

---

[3] Although the majority does not reach Walker's claim regarding the erroneous jury instructions, I would not issue a certificate of appealability as to that claim because Walker has not made a "substantial showing of the denial of a constitutional right." *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999), *quoting* 28 U.S.C. § 2253(c)(2). Although it "is a violation of due process for a jury instruction to omit an element of the crime," habeas petitioners "are not entitled to relief unless they can establish that the error resulted in actual prejudice." *Evanchyk v. Stewart*, 340 F.3d 933, 939–41 (9th Cir. 2003) (internal quotation marks omitted). However, as the California Supreme Court reasonably concluded, Walker has not shown actual prejudice because "the record establishes beyond doubt that defendant acted with intent to kill in this case" even if he was not the triggerman. Accordingly, I do not believe that "that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).